P. A. M. NEWS CORPORATION et al., Appellants,

v.

Earl L. BUTZ, Individually and in his Capacity as Secretary of Agriculture, et al.

No. 73–2096.

United States Court of Appeals, District of Columbia Circuit.

Argued February 21, 1975.

Decided June 9, 1975.

Raymond G. Larroca, Washington, D. C., with whom Nathan Lewin, Washington, D. C., was on the brief for appellants. William H. Jeffress, Jr., Washington, D. C., also entered an appearance for appellant.

Judith S. Feigin, Atty. Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Washington, D. C., were on the brief for appellees.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

In this case, appellant P.A.M. News Corp. (P.A.M.)[1] challenges on statutory

---

1. L.F.M. News, Inc., the other plaintiff in this suit has now merged with P.A.M. All references to P.A.M. constitute a reference to L.F.M., except in certain obvious factual contexts.

and first amendment grounds an innovation inaugurated by the Market News Service of the United States Department of Agriculture (USDA) which allows subscribers to hook-up directly to USDA's information circulation system. Finding the government's action both statutorily authorized and constitutionally permissible, we affirm the district court's grant of summary judgment for the government.

P.A.M.'s business is the dissemination of agricultural information. Its service focuses upon the fresh fruit and vegetable industry; utilizing data collected both from USDA, its own staff of reporters, and other news sources, P.A.M. collates, edits, analyzes, and assembles the information into its own format and then transmits it to its customers over facilities leased from Western Union Telegraph Company. Topics covered range from prices, market conditions and forecasts to weather reports and business and general news items. A. 54. Similarly, LFM News, Inc., focusing upon the livestock, feed, and meat industries, collates, edits, analyzes, and transmits its information over a teletypewriter circuit leased from American Telephone and Telegraph Company (A.T.&T.) to subscribing packers, brokers, and growers. A. 55–56.

> The Appendix from the first appeal in this case has been made a part of the record in this appeal and is referred to as "A." Citations to the second appendix, prepared for this appeal, are referred to as "2A."

2. In its establishing statute, 7 U.S.C. § 2201 (1970), USDA is charged, *inter alia,* with the duty "to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture . . ." In 7 U.S.C. § 1622(g), (k) (1970), the Secretary of Agriculture is directed and authorized:

> To collect and disseminate marketing information, including adequate outlook information on a market-area basis . . . .
> . . . [and to] collect, tabulate, and disseminate statistics on marketing agricultural products, including, but not restricted to statistics on market supplies, storage stocks, quantity, quality, and condition of such products in various positions in the marketing channel, utilization of such products, and shipments and unloads thereof.

See also 7 U.S.C. § 511h (1970) (publication of information on tobacco).

Since its creation, USDA, under its statutory mandate,[2] has disseminated agricultural information to the public. Since 1917, it has utilized a wire network leased from A.T.&T., connecting USDA Market News Service branch offices, in order to expedite the collection and dissemination of information. However, prior to August 1, 1963, USDA did not permit any information carried over its wire network to be received directly off that network by anyone utilizing direct extension connections (drops) to the network. A. 61. Certain users of USDA Market News could arrange, at the user's expense, to receive some of the information *after* it had cleared the wire network.[3]

On August 1, 1963, USDA inaugurated a service whereby the public could arrange with A.T.&T. for a direct extension off its wire service and thereby receive news service information directly.[4] The innovation was prompted by technological advances which permitted USDA to transmit certain private inter-office information over the network while bypassing the drop customer's receiving machines. 2A. 67.

On November 4, 1963, appellant filed suit against the government and A.T.&T. seeking declaratory and injunctive relief

3. A. 60. To do so, the teletypewritten tape would be taken off the USDA receiving machines and then transmitted on a sending machine the user had provided in the USDA office over other teletypewriter circuits leased and paid for by them. A. 60–61. One such user was the predecessor of P.A.M. which also paid a wordage charge to USDA for this service. A. 46, 348.

4. The inauguration of this service was preceded by May 1, 1963 notice in the Federal Register announcing that consideration was being given to the innovation in order "to facilitate more rapid and more extensive dissemination of market news" and soliciting comments. 28 Fed.Reg. 5240 (1963). P.A.M. submitted a telegram objecting to the proposal. A. 65–66. In July, USDA issued a press release announcing the new service and issued a circular, AMS–510, describing the system's operation. A. 67–68. P.A.M. filed a "petition to Suspend or Reject" the A.T.&T. tariff authorizing the system with the Federal Communication Commission; on July 31, 1963, the petition was denied. A. 68–69.

alleging that the direct extension service was not authorized by statute, and even if authorized, violated the first amendment. In 1968, the district court dismissed the complaint and held that appellant, "alleging mere competitive injury, lack[s] standing to complain of the operation of the direct extension service" and that the service resulted in no abridgement of appellant's first amendment rights.[5] On appeal, we reversed the district court's holding on standing. P.A.M. News Corp. v. Hardin, 142 U.S. App.D.C. 227, 440 F.2d 255, 257 (1971). However, we did not reach the merits of appellant's constitutional claims because "[c]ourts generally prefer to rule upon constitutional questions which involve the scope of power of an administrative agency only after the agency itself has considered the constitutional issue and made a determination about the weights of competing administrative policies and interests." Id. Since we found that the record did not indicate whether USDA had complied with section 4 of the Administrative Procedure Act (APA),[6] by publishing a statement of the basis for its action, we remanded the case with instructions to consider that issue. 440 F.2d at 258–59.

Following that decision, the district court entered an order requiring that appellees comply with the APA and that the rule without an accompanying concise general statement was unlawful, null and void. 2A. 19–20. Thereafter, USDA published a statement of purpose on April 25, 1972. 37 Fed.Reg. 8121 (1972). On February 7, 1973, the district court held that this statement fulfilled USDA's APA obligations and that the case was ripe for consideration on the merits. 2A. 39–40. On cross-motions for summary judgment, the district court found for the government, holding that the direct extension service does not violate appellant's first amendment or statutory rights. 2A. 73. This appeal followed.

Appellant urges four grounds for reversal. It argues that USDA has still failed to comply with APA requirements, that the challenged innovation is in excess of appellee's statutory authority, and that the service must be invalidated since it constitutes an unconstitutional infringement of appellant's first amendment rights. Finally, it asserts that the grant of summary judgment and refusal to allow discovery were improper. We turn first to the procedural argument on which appellant prevailed in its first appeal.

P.A.M. asserts that the Governmental News Service is still being operated under a rule adopted without observance of APA requirements. It charges that the April 25, 1972 general statement was defective in that seventeen of its twenty-two pages were a verbatim reproduction of a document submitted to a United States Senator in 1963 coupled with conclusional and argumentive material. Thus, P.A.M. opines that the statement fails to reflect a "reasoned consideration" of the constitutional questions raised in which the government must engage. Appellant's Br. at 46–49; see 440 F.2d at 257, 258 n. 4.

We disagree. Section 553(c) only requires "a concise general statement;" we have noted that "[w]hen promulgating a rule, an agency is not required to abide by the same stringent requirements of fact findings and supporting reasons

---

5. A. 106. The district court also dismissed the complaint against A.T.&T. That dismissal was not seriously challenged on appeal, and was affirmed by this court which stated "AT&T need no longer be a party to this action." P.A.M. News Corp. v. Hardin, 142 U.S.App. D.C. 227, 440 F.2d 255, 259 n. 7 (1971).

6. The relevant portion of the statute reads:

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the ruling making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, *the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.*

5 U.S.C. § 553(c) (1970) (emphasis added).

which apply to adjudication." Mobil Oil Corp. v. Federal Power Comm'n, 152 U.S.App.D.C. 119, 469 F.2d 130, 139 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973). Our previous decision in this case, while ensuring USDA's complaince with statutory requirements and with the basic administrative rule of reasoned decision-making, was also made in light of our recognition that "[a]ny judicial review of administrative action—whether the question is the constitutionality of the relevant action or the statutory authorization—is more intelligently undertaken when it is informed by the agency's own view of its authorized powers." 440 F.2d at 259 n. 6. USDA's view has now been placed on the record in the appropriate form and manner. Moreover, we also believe the statement indicates adequate consideration of the potential problems posed by the direct extension system. The statement responds to arguments posited by the American Newspaper Publishers Association which raised similar objections to P.A.M.'s and concludes that "the system does not abridge the constitutional guarantees of any person . . . ." 2A. 64; see id. at 52–63. The incorporation of a 1963 letter does not make the statement defective, as it canvassed the relevant issues, and the 1972 statement

affirmed that the letter continues to represent its views.[7]

We now turn to the gravamen of P.A.M.'s complaint—that the direct extension service constitutes an unconstitutional infringement of appellant's first amendment rights. Appellant's argument, grounded upon the free press guarantee, is fourfold. P.A.M. asserts that its service is entitled to first amendment protections; that "unlawful and unfair competition by a government agency with a press entity violates the first amendment;" that the USDA news extension service has seriously damaged it in the exercise of its first amendment rights; and that the government has not demonstrated the necessary compelling interest to override the abridgement of appellant's rights. Appellant's Br. 26–45.

 At the outset, we strongly endorse many of P.A.M.'s premises concerning the question before us. Any possible governmental interference with the rights of a free press must be searchingly scrutinized. See, e. g., Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). "A broadly defined freedom of the press assures the maintenance of our political system and an open society." Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967). Among the "evils to

---

7. 2A. 39. P.A.M. also argues that even if USDA's general statement were adequate, its failure to comply with other APA requirements in April, 1972, renders the rule void. Appellant asserts that the district court's order of April 21, 1972, declaring the 1963 rule "unlawful, null and void," 2A. 19, coupled with this court's finding that "the institution of the direct extension service . . . constituted the adoption of a 'rule' within the meaning of" the APA, 440 F.2d at 258 n. 4, yields the conclusion that USDA was required to comply fully with section 553 in April, 1972. Appellant asserts that USDA failed to give the required notice and that therefore reversal is mandated on that ground. We disagree. We note first that P.A.M. objected to the 1963 rule on notice grounds, that the district court made adverse findings against appellants on the issue, and that P.A.M. failed to pursue the matter on appeal. Id. at 258 n. 5. It appears clear that the crux of this court's holding was that appellees develop a general statement of purpose, assuming it wished to adhere to its proposed rule. Although striking down the rule itself, the general statement was also the main concern of the district court's April 21,

1972 Order. 2A. 19–20. USDA has fully complied with those instructions. However, even if we read the district court's order as appellant does, it is equally possible to interpret USDA's Statement of April 24th as in compliance with section 553. The reaffirmation of the rule is a republication by reference. 37 Fed.Reg. at 8124 (1972). Previously submitted comments were "carefully considered." The statement noted that "[a]ll interested persons have had actual and timely notice of the system for many years." In light of the above two statements, "it does not appear that further public procedures with respect to this matter would develop any further useful information regarding the matter." Id. This provides a statement of reasons for dispensing with notice and public procedures as authorized by 5 U.S.C. § 553(b)(3)(B); that USDA technically violated the statute by failing to include an explicit finding that such procedures were "impracticable, unnecessary, or contrary to the public interest" does not constitute cause for reversal here in light of the conflicting inferences inherent in the court opinions.

be prevented" by the first amendment press guarantee are "not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens. Grosjean v. American Press Co., 297 U.S. 233, 249–50, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936), *quoting* 2 Cooley's Constitutional Limitations 886 (8th ed.). Thus, first amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960).

 We also agree with appellant that its wire services fall within the protective umbrella of the first amendment press guarantee. *See, e. g.,* Smith v. California, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Thomas v. Collins, 323 U.S. 516, 531, 65 S.Ct. 315, 89 L.Ed. 430 (1945). However, we cannot endorse P.A.M.'s conclusion that the direct extension service represents an unconstitutional infringement on its first amendment rights because we conclude that the USDA's actions do not abridge any cognizable first amendment interest of appellant.

As P.A.M. makes clear, it is not arguing that USDA cannot, consistent with the first amendment, disseminate agricultural information, but is claiming that the *means* chosen by USDA, the direct extension service, abridges its first amendment rights. Appellant's Br. at 35–37. However, the direct extension service does not result in a prior restraint or restriction on what appellant may publish, does not insulate sources of information from appellant, nor does it

impose any tax or penalty for the privilege of publishing. *Cf.* Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). What the new service represents is an increase of the public's access to information. The information, which appellant had requested exclusive access to in 1959, is now available to all on an equal basis. Appellant's news gathering ability has only been enhanced, not abridged, by the USDA's innovation making its information available more directly and rapidly. Moreover, in a larger sense, the Government's actions here further a cornerstone of the first amendment—the maximum distribution of information in the marketplace. *See, e. g.,* Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

 It is clear that not every action by the government which affects the press violates the first amendment. "The Amendment does not forbid [governmental activity] which ends in no restraint upon expression or in any other evil outlawed by its terms and purposes." Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 193, 66 S.Ct. 494, 497, 90 L.Ed. 614 (1946) (footnote omitted). *See also* Branzburg v. Hayes, *supra;* Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Associated Press v. NLRB, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937). However, appellant argues that it has been economically injured by this governmental action and has been placed at an insurmountable competitive disadvantage.[8] This, it claims, violates the first amendment, relying upon Grosjean v. American Press Co., *supra,* 297 U.S. at 244–45, 56 S.Ct. 444, for the proposition that government activity which curtails the press' income and inhibits circulation is constitutionally impermissible.

8. Appellant hints that the government has deliberately attempted to destroy it economically. It accuses USDA of "engaging in the crassest type of commercial competitive activity" by "entering into head-to-head competition with the private press parties; undercutting prices; [and] copying features, formats and coverage." Appellant's Reply Br. at 3. However, the district court found that USDA was motivated by technological advances. 2A. 67. There is no finding of fact evidencing that the government engaged in cutthroat competition; instead, the court found that those claims "lack merit." *Id.* at 74. We do not believe that finding was erroneous and will confine our discussion to the inevitable economic loss resulting from the direct extension service.

We cannot agree that the instant case falls within the rationale of *Grosjean.* As the Court there made clear:

> The tax here involved is not bad because it takes money from the pockets of the [press]. . . . It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device . . to limit the circulation of information to which the public is entitled in virtue of constitutional guaranties.

*Id.* at 250, 56 S.Ct. at 449 (emphasis added). That is not the case here. The Government is increasing, not limiting, the flow of information. The first amendment profits from this sort of governmental activity. Any economic loss suffered by appellant occurs because P.A.M. need no longer serve as a *retransmitter* of government information. If P.A.M. performs a valuable press service through offering additional items of news and analysis, it will succeed and thrive in the marketplace. In sum, we hold that the wire extension service infringes no first amendment interest of appellant. In light of that conclusion, we need not balance the governmental interest behind the innovation against the alleged unconstitutional abridgement.

We now briefly dispose of appellant's final two arguments. P.A.M. contends that the direct extension service is not authorized by statute. Appellant's Br. at 39–45. The foundation appellant lays for acceptance of this argument is that it avoids reaching the "serious constitutional doubts" surrounding USDA's action. However, since we have concluded that the innovation is free of the unconstitutional coloration with which P.A.M. attempts to taint it, we no longer consider that factor. We reject appellant's argument and find ample statutory authority for the service. *See* note 2 *supra.* We recognize that the agency has primary discretion in implementing its statutory mandates, *e. g.,* United States v. Shimer, 367 U.S. 374, 381–82, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961), and think that USDA has exercised that discretion in a proper and publicly beneficial manner here.

Finally, appellant asserts that the district court erred in denying it discovery which could have established the existence of a material disputed fact. Thus, P.A.M. argues the grant of summary judgment was improper. Appellant's Br. at 51–56. The thrust of its argument is that discovery would have tested whether USDA had in fact sufficiently consulted with state agricultural departments as required by 7 U.S.C. § 1621 (1970) and had in fact considered the submitted comments, under 5 U.S.C. § 553, before promulgating its rule. P.A.M. relies primarily on our decision in Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971), for the proposition that such discovery was warranted before summary judgment could be awarded.

We believe, however, that summary judgment was properly granted. We note first that the district court found adversely to appellant on both the sections 1621 and 553 questions. 2A. 39–40, 69. Contrary to appellant's assertions, 7 U.S.C. § 1621 is not a mandatory requirement, but merely urges consultation with state agencies "[t]o the maximum extent practicable;" we cannot see how discovery could have raised a material factual question vis-a-vis this section.[9] On its second point, P.A.M. hoped to establish that insufficient weight, contrary to the APA, was given to the submitted comments. *Nuclear Responsibility* cannot aid appellant here; in that case discovery was appropriate to probe for the existence of evidence that would have to be disclosed and evaluated in an environmental impact statement. 463 F.2d at 787–88. Section 553 of the APA does not require the explicit inclusion of specific information; in this circumstance, the district court was correct in finding as a matter of law that the APA requirements had been met and granting summary judgment.

---

**9.** It is uncontroverted that USDA solicited and received comments from state agencies. *See* A. 66, 273–88.

In sum, we have considered the arguments ably raised by appellant, but find that none necessitate reversal. The judgment, therefore, is

Affirmed.